**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Larry Wayne CASSITY (81–1565), Billy Sword (81–1566), Stephen Gordon Lenk (81–1567), Defendants-Appellants.**

**Nos. 81–1565, 81–1566 and 81–1567.**

United States Court of Appeals,
Sixth Circuit.

Argued March 23, 1983.
Decided Oct. 31, 1983.

452

Edward Wishnow, Southfield, Mich. (court-appointed), for Cassity.

Thomas Rosender, argued, Pontiac, Mich. (court-appointed), for Sword.

Edward Wishnow, Southfield, Mich. (court-appointed), for Lenk.

Leonard R. Gilman, U.S. Atty., Maura D. Corrigan, Asst. U.S. Atty. (argued), Detroit, Mich., for plaintiff-appellee in all cases.

Before MARTIN and JONES, Circuit Judges, and BROWN, Senior Circuit Judge.

BOYCE F. MARTIN, Jr., Circuit Judge.

This case, before us for the second time, raises important fourth amendment issues. When first confronted with this case, this court was asked to consider, *inter alia,* whether the monitoring of an electronic homing transmitter (beeper) could ever amount to a search and seizure in fourth amendment terms. Citing *United States v. Bailey,* 628 F.2d 938, 943 (6th Cir.1980), a decision reached in the interim between trial and appeal of this case, we answered affirmatively. *United States v. Cassity, et al. (Cassity I),* 631 F.2d 461 (6th Cir.1980). Simultaneously we considered and answered the question of the validity of the warrants obtained by the police prior to the installation and monitoring of the beeper transmitters. We held the warrants invalid due to lack of time limits. However, find-

ing ourselves without the benefit of an evidentiary record on the issue of the individual defendants' expectations of privacy and therefore unable to determine whether the challenged warrantless monitoring impinged upon the defendant's constitutional rights, we remanded the case to the lower court for further fact-finding.

On remand, the district court, 546 F.Supp. 611, after hearing evidence on the defendants' expectations of privacy, determined that three[1] of the four had been the victims of unconstitutional searches. It declined to suppress evidence gleaned as a result of these searches, however, holding that the rule announced in *Bailey* should not be given retroactive effect. Accordingly, it affirmed the convictions. That decision is before us on appeal. We now reverse that decision.

### I.

The facts are succinctly summarized in *Cassity I.*

These cases arose from the undercover investigative efforts of Special Agent John Graetz of the Drug Enforcement Administration (DEA). From April to August 1977, Agent Graetz posed as a supplier of precursor chemicals and laboratory glassware to Jay Cody, who is alleged to be the central figure in the conspiracy. Cody apparently coordinated the conspirators' operations, arranged to obtain necessary chemicals and equipment and delivered samples of amphetamine manufactured in the conspirators' clandestine laboratory.

Among the chemicals and equipment Agent Graetz delivered to Cody at various times were secreted three electronic homing devices, or beepers. Two were located in cans of precursor chemicals and one was hidden in a heating mantle. All three beepers were installed pursuant to search warrants issued by a United

---

[1]. The fourth defendant, Hines, claimed that monitoring a beeper secreted in a can of chemicals traveling in the back of a van driven by him on a public highway amounted to an unconstitutional search. The district court disagreed, finding that he lacked an expectation of privacy in the contents of the van. By order date October 4, 1983, we have affirmed Hines' conviction.

States Magistrate. However, none of the warrants contained a time limit.

Agent Graetz delivered the first beeper on July 11, 1977. By monitoring the beeper's signals, DEA agents traced the chemicals to defendant Cassity's home at 2803 Stair Street in Detroit. On July 15, the beeper's signals indicated the chemicals had been moved to defendant Sword's home at 1494 Calvary in Detroit. On July 28, Agent Graetz delivered the other two beepers, which also were monitored to Sword's home. On August 11, 1977, all three beepers were located in the basement of defendant Dean's home at 6344 Hanson in Detroit.

DEA agents monitored the beepers' signals until August 17. They observed all five defendants and Cody enter and leave the house at 6344 Hanson at various times during the monitoring. On three occasions during the beeper surveillance, Cody delivered samples of amphetamine allegedly produced by the conspirators.

On August 17, 1977, DEA agents executed a search warrant at 6344 Hanson. In the basement, they found a complete laboratory which expert testimony established was capable of producing amphetamine. The agents did not, however, find any trace of amphetamine on the premises. Investigation revealed that a number of chemical containers and pieces of laboratory equipment bore the fingerprints of defendants Lenk, Sword, Dean and Hines.

The defendants were indicted, along with Cody, for conspiring to manufacture and manufacturing amphetamine in violation of 21 U.S.C. §§ 841(a)(1) and 846. The indictment also charged Cody with ten counts of possessing and distributing amphetamine. However, Cody remained a fugitive and was not tried with the appellants.

The case went to trial on July 18, 1978. The Government's case against the appellants consisted primarily of testimony that all the appellants had been observed in and around the laboratory's location (Dean's home) the day of the search; that Cassity and Sword previously had stored precursor chemicals and laboratory equipment in their homes; that Hines had picked up chemicals and glassware left in a rented van by Agent Graetz; that Lenk was in the laboratory at the time of the search; and that fingerprints of four of the appellants were found on glassware in the laboratory. In addition, the Government introduced tape recordings of Cody's numerous telephone conversations with Agent Graetz, as well as the samples of amphetamine Cody had delivered to Graetz.

The jury convicted all five appellants of conspiracy and manufacturing amphetamine.

631 F.2d at 462–63.

Several issues are presented here. Defendants argue that the district court exceeded its mandate on remand when it considered the question of the retroactive application of the *Bailey* decision to the facts of this case. Moreover, they argue that the manner in which the court resolved the question was erroneous. The government disagrees and, additionally, asserts that the lower court erroneously concluded that defendants Sword, Lenk, and Cassity had successfully proven legitimate expectations of privacy in those areas subject to beeper monitoring.

Shortly before oral argument in this case, the Supreme Court delivered an opinion in *United States v. Knotts,* —— U.S. ——, 103 S.Ct. 1081, 75 L.Ed.2d 55 (1983). Because *Knotts* concerned warrantless beeper monitoring, we asked the parties to brief the decision. We have received those briefs, considered the question, and now hold, as a preliminary matter, that *Knotts* does not affect our decisions in either *Bailey* or *Cassity I* or control our resolution of the issues here.

In *Knotts,* the police utilized electronic beeper surveillance to track the movement of chemicals in an automobile on an open highway and, when highway surveillance was interrupted, to locate the chemicals under a barrel outside a cabin on private property. The Court, reversing the court of

appeals, held that the monitoring did not invade any legitimate expectation of privacy on the defendant's parts and, therefore, that there was neither a search nor a seizure in fourth amendment terms.

Although the opinion contains some sweeping language suggesting a broad expansion of search and seizure law, read as a whole *Knotts* does little more than apply established doctrine to an unconventional type of search. The majority relies on the "automobile exception" to the fourth amendment, *see Cardwell v. Lewis,* 417 U.S. 583, 94 S.Ct. 2464, 41 L.Ed.2d 69 (1974), and the open fields doctrine, *see Hester v. United States,* 265 U.S. 57, 44 S.Ct. 445, 68 L.Ed. 898 (1924), to validate the electronic tracking. Common to both concepts is the notion of diminished expectation of privacy in those things otherwise open to public inspection. The beeper, said the Court, revealed nothing more to the police than constitutionally permissible visual surveillance could have revealed.

Visual surveillance from public places along Petschen's route or adjoining Knotts' premises would have sufficed to reveal all of these facts to the police. The fact that the officers in this case relied not only on visual surveillance, but on the use of the beeper to signal the presence of Petschen's automobile to the police receiver, does not alter the situation. Nothing in the Fourth Amendment prohibited the police from *augmenting the sensory faculties* bestowed upon them at birth with such enhancement as science and technology afforded them in this case.

—— U.S. at ——, 103 S.Ct. at 1086, 75 L.Ed.2d at 63.

The use to which the police may put a beeper without first obtaining a warrant is "limited", however. *Id.* —— U.S. at ——, 103 S.Ct. at 1086, 75 L.Ed.2d at 64. Nothing in the Court's opinion abrogates the sanctity of a private home or dwelling place. Although "no ... expectation of privacy extended to the visual observation of [the defendants'] automobile arriving on his premises after leaving a public highway,

nor to movements of objects such as the drum of chloroform outside the cabin in the 'open fields'", *id.* —— U.S. at ——, 103 S.Ct. at 1085, 75 L.Ed.2d at 62, the defendant "undoubtedly had the traditional expectation of privacy within a dwelling place insofar as the cabin was concerned." *Id.*

*As we have noted, nothing in this record indicates that the beeper signal was received or relied upon after it had indicated that the drum containing the chloroform had ended its automobile journey at rest on respondent's premises in rural Wisconsin.* Admittedly, because of the failure of the visual surveillance, the beeper enabled the law enforcement officials in this case to ascertain the ultimate resting place of the chloroform when they would not have been able to do so had they relied solely on their naked eyes. But scientific enhancement of this sort raises no constitutional issues which visual surveillance would not also raise. A police car following Petschen at a distance throughout his journey could have observed him leaving the public highway and arriving at the cabin owned by respondent, with the drum of chloroform still in the car. This fact, along with others, was used by the government in obtaining a search warrant which led to the discovery of the clandestine drug laboratory. *But there is no indication that the beeper was used in any way to reveal information as to the movement of the drum within the cabin, or in any way that would not have been visible to the naked eye from outside the cabin.* Just as notions of physical trespass based on the law of real property were not dispositive in *Katz, supra,* neither were they dispositive in *Hester v. United States,* 265 U.S. 57 [44 S.Ct. 445, 68 L.Ed. 898] (1924). *Id.* —— U.S. at ——, 103 S.Ct. at 1087, 75 L.Ed.2d at 64 (emphasis added).

In *Bailey,* we said "beeper surveillance of non-contraband personal property in private areas trenches upon legitimate expectations of privacy and constitutes a search or seizure within the meaning of the fourth amendment." 628 F.2d at 944. Nothing in

*Knotts* erodes that principle as it applies to monitoring beepers located in areas in which the subject of the search exhibits a legitimate expectation of privacy. *See Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); *Bailey,* 628 F.2d at 940; *United States v. Karo,* 710 F.2d 1433, 1439 (10th Cir.1983). We come back, then, to the question we posed on remand— namely, whether defendants Lenk, Sword, or Cassity, had exhibited a legitimate expectation of privacy in those places into which they carried the chemicals containing the beepers. *Cassity I,* 631 F.2d at 464–65. The district court held that they had. We agree.

■ Because fourth amendment rights are "personal," *Rakas v. Illinois,* 439 U.S. 128, 140, 99 S.Ct. 421, 428, 58 L.Ed.2d 387 (1978), the central inquiry in any suppression hearing is whether the defendant challenging the admission of evidence has shown a legitimate expectation of privacy in the place searched or the thing seized. *United States v. Salvucci,* 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980). Whether a legitimate expectation of privacy exists in a particular item or place is a determination to be made on a case-by-case basis. *Brown,* 635 F.2d 1207 at 1211. That question in turn entails a two-part inquiry: (1) whether the individual defendant has exhibited an actual subjective expectation of privacy and (2) whether that expectation is one society recognizes as reasonable or legitimate. *Katz v. United States,* 389 U.S. 347, 362, 88 S.Ct. 507, 517, 19 L.Ed.2d 576 (1967) (Harlan, J. concurring); *Smith v. Maryland,* 442 U.S. 735, 740–41, 99 S.Ct. 2577, 2580–81, 61 L.Ed.2d 220 (1979); *United States v. Brown,* 635 F.2d 1207 (6th Cir.1980); *United States v. Bailey,* 628 F.2d 938, 940–41 (6th Cir.1980).

■ "Legitimation of expectations of privacy by law must have a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society." *Rakas,* 439 U.S. at 143 n. 12, 99 S.Ct. at 430 n. 12. To identify which expectations merit fourth amendment protection, the courts have pointed to a number of factors. Most obvious among these is an individual's possessory or proprietary interest in the place or thing. However, a property right alone is not determinative of whether the individual reasonably expected "freedom from governmental intrusion." *Mancusi v. De Forte,* 392 U.S. 364, 368, 88 S.Ct. 2120, 2123, 20 L.Ed.2d 1154 (1968). In *United States v. Haydel,* 649 F.2d 1152 (5th Cir.1981), *rehearing denied,* 664 F.2d 84, *cert. denied,* 455 U.S. 1022, 102 S.Ct. 1721, 72 L.Ed.2d 140 (1982), the Fifth Circuit identified other factors any one of which or any combination of which could, in the circumstances of a specific case, signify legitimacy.

No one circumstance is talismanic to the *Rakas* inquiry. "While property ownership is clearly a factor to be considered in determining whether an individual's Fourth Amendment rights have been violated, property rights are neither the beginning nor the end of . . . [the] inquiry." *United States v. Salvucci,* 448 U.S. 83, 92, 100 S.Ct. 2547, 2553, 65 L.Ed.2d 619, 628 (1980) (citation omitted). Other factors to be weighed include whether the defendant has a possessory interest in the thing seized or the place searched, whether he has the right to exclude others from that place, whether he has exhibited a subjective expectation that it would remain free from governmental invasion, whether he took normal precautions to maintain his privacy and whether he was legitimately on the premises. *See Id.; Rawlings v. Kentucky,* 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980); *Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). As the very listing of these factors demonstrates, the expectation must be based on considerations outside of the fourth amendment. *Rakas v. Illinois,* 439 U.S. at 142–145 n. 12, 99 S.Ct. at 430–31 n. 12, 58 L.Ed.2d at 400–402 n. 12.

*Id.* at 1154–55.

■ In *Bailey,* this court held that defendants who had stored chemicals containing a beeper transmitter in a locked storage

room in the basement of an apartment complex had "exhibited an expectation of privacy in the location of the chemicals which, but for the beeper surveillance, would have been entirely justified." *Id.* at 944. *See United States v. Carriger,* 541 F.2d 545 (6th Cir.1976) (tenants of apartments may have the same expectation of privacy in their apartments as homeowners in their homes). There is little difference between that situation and the situation presented by Cassity and Sword's claims here. Sword resided at 1494 Calvary Street, a three- or four-unit[2] apartment complex with his girlfriend, a child, and cotenants. The chemicals containing the beeper were kept in the locked basement to which only Sword and a friend had the key. It was not a common area accessible to public and tenants alike. *See Fixel v. Wainwright,* 492 F.2d 480, 484 (5th Cir.1974). There is no evidence that his friend consented to the search. *See United States v. Matlock,* 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974); *United States v. Sumlin,* 567 F.2d 684, 687 (6th Cir.1977), *cert. denied,* 435 U.S. 932, 98 S.Ct. 1507, 55 L.Ed.2d 529 (1978). In Cassity's case, he had resided with his parents at 2803 Starr Street twenty to twenty-five years. He kept his clothes and other personal effects there. Although he did not personally own the house, for all intents and purposes, it was his home. We think it indisputable that Cassity had an expectation of privacy which was legitimate in the Starr Street address. *See Haydel,* 649 F.2d at 1155 (son had a legitimate expectation of privacy in gambling records kept in parents' home although he did not reside there regularly). Moreover, that expectation reasonably extended to all parts of the home, including the garage. *See United States v. Banerman,* 552 F.2d 61, 64–65 (2d Cir.1977) (lessees of a commercial building who had expectation of privacy in offices could also legitimately expect privacy in the garage).

■ The government argues that neither Cassity nor Sword can establish even a subjective expectation of privacy in the chemicals because neither admitted to ownership of or knowledge of the containers. This argument misconstrues the basis for finding that Cassity and Sword have "standing" to object to the government's actions in this case. Whether beeper monitoring in a private home is characterized as a search or a seizure is unimportant. *Bailey,* 628 F.2d at 940. What is important is that it entails governmental intrusion into an area when privacy can most legitimately be expected. *See United States v. Weeks,* 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914); *Bailey,* 628 F.2d at 944. It is this fact—the intrusive monitoring of objects within the sanctity of the home—which permits Cassity and Sword to successfully suppress any and all evidence garnered as a result.

■ Lenk was a guest in Dean's home when the police entered with a search warrant. At the time of the search, he was in the basement working in what was shown to be the laboratory used by the defendants to manufacture the illegal drugs. Seized in the search was a bag containing Lenk's personal effects, as well as papers on which were written chemical formulas. The government, relying primarily upon the Tenth Circuit's decision in *United States v. Clayborne,* 584 F.2d 346, 348 (1978), argues that Lenk may not object to the search because "no one, at least no non-resident, could derive rights that society should be prepared to recognize as legally justified from his work in a clandestine drug laboratory." Government brief, p. 41. The government misses the point, however. It is Lenk's status as a guest of Dean's and not his presence as a chemist in a clandestine drug laboratory which gives him a subjective expectation of privacy the police were not privileged to infringe.

In *Jones v. United States,* 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), the Supreme Court advanced "the unremarkable proposition that a person can have a legally sufficient interest in a place other than his own home so that the Fourth Amendment protects him from unreasonable governmental intrusion into that place." Al-

---

**2.** It is unclear from the record.

**458**

though in subsequent decisions, the Court has narrowed somewhat the sweeping provisions of *Jones,* it remains the law that one who resides at a private residence with permission of the owner as a guest or invitee may demonstrate an expectation of privacy in the premises legally sufficient to support a challenge to a police search. *See Rakas,* 439 U.S. at 141–142, 99 S.Ct. at 429–30. Like the defendant in *Jones,* Lenk was at the Dean home with permission of the owner, came and went freely, and kept his personal belongings there. He testified that he expected privacy. These facts are sufficient to establish a legitimate, reasonable expectation of privacy protected by the Fourth Amendment.

*Clayborne* is easily distinguishable. The court's opinion is predicated explicitly on the commercial nature of the building, which, it said, "was susceptible not only to outside viewing, but also to ingress and egress of the public." *Id.* at 350 (footnote omitted). "Strict privacy," the court continued, "as in a home was not to be properly expected here." *Id.* In contrast, the Hanson Street location was a private home where the homeowner, Dean, and his guest Lenk, could properly expect freedom from uninvited intrusions. The fact that part of the home was used for illegal purposes does not obviate this conclusion. As the district court stated, when the *Jones* Court held that "wrongful" presence at the scene of the search would preclude the legitimacy of the privacy expectation, "wrongful" was used to refer to the occupancy of the premises, not its use. *See Rakas,* 439 U.S. at 141 n. 9, 99 S.Ct. at 429 n. 9. We also agree with the district court's determination that the facts that the monitoring began before Lenk arrived and that a warrant was obtained prior to the search of the house do not save the government's case. Whether or not Lenk was in the house as a guest when the illegal monitoring began is irrelevant. When he arrived, the monitoring was still in progress. Therefore what we have already found to be Lenk's legitimate expectation of privacy in the premises was infringed. In effect, he steps into the shoes of the homeowner, whose ongoing interest

in the privacy of his home permits him to challenge any intrusion, regardless of whether he was present or not.

■ The government also argues that because it obtained a search warrant prior to entering the Hanson Street address the search and any evidence seized were legal. We disagree. The location of the Hanson Street building was ascertained through illegal beeper monitoring. Once located, additional evidence arguably sufficient to show probable cause was otherwise legally gathered through visual surveillance and other means. However, the fact remains that but for the beeper, the opportunity to gather other evidence might not have arisen. This additional evidence, therefore, is fruit of the initial illegal search. *See Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

■ Having concluded that Lenk, Sword and Cassity had shown legitimate expectations of privacy which the government's warrantless beeper monitoring had infringed, the district court went on to consider and resolve in the negative the issue of whether *Bailey* should be applied retroactively to exclude the tainted evidence. To reach that issue was error. In *Cassity I,* we explicitly stated that the scope of the court's task on remand was limited to determining "whether the beeper surveillance by the Government invaded . . . [the defendant's] . . . legitimate expectation of privacy." To that end, the court was to hold "suppression hearings," and if it found such an invasion, to grant the suppression motion. That the court was not then to proceed to consider the retroactivity issue was equally obvious from other language in *Cassity I* making it plain that this court had already considered and resolved the issue. *Id.* at 464–465 ("Given our *Bailey* decision . . .; As our *Bailey* decision makes clear . . . On remand the district court should undertake the analysis outlined in *Bailey.*")

To conclude, because we affirm the district court's findings that Lenk, Sword, and Cassity each had legitimate expectations of privacy in the respective locations subjected

to beeper monitoring, monitoring without a warrant violated the Fourth Amendment. Evidence gleaned as a result of the monitoring should be suppressed. We vacate the lower court's decisions on the question of Bailey's retroactivity, that issue having been improperly considered. Of course, should the government elect to retry these defendants, the exclusion of evidence need not be complete for all defendants. For example, evidence seized from Hanson Street, while inadmissible against Lenk because its seizure violated a legitimate privacy interest of his, is admissible for any relevant purpose against either Sword or Cassity, neither of whom have legitimate expectations of privacy in that house. Because all the evidence was admitted in a joint trial, however, we are unable here to selectively determine the actual effect of erroneous admission on each defendant.