**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Winston Hall WORTHINGTON, M.D.,**
**Defendant-Appellant.**

**No. 80–5354.**

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 15, 1982.
Decided January 25, 1983.

Hal Gerber and Ronald Krelstein, Memphis, Tenn., argued, for defendant-appellant on appeal only and not at trial.

W.J. Michael Cody, U.S. Atty., Arthur S. Kahn (argued) and Daniel A. Clancy, Asst. U.S. Attys., Memphis, Tenn., for plaintiff-appellee.

Before EDWARDS, Chief Circuit Judge, CONTIE, Circuit Judge and WEICK, Senior Circuit Judge.

WEICK, Senior Circuit Judge.

Appellant, Winston Hall Worthington (defendant or appellant), was indicted by the Federal Grand Jury for the Western District of Tennessee, Western Division, on

November 17, 1978, in a 300 count indictment of which 176 counts charged him with making false claims to the United States and the Department of Health, Education and Welfare (HEW), in violation of 18 U.S.C. § 287; 70 mail fraud counts charged him with submitting false and fraudulent Medicaid and Medicare claims to defraud the United States in violation of 18 U.S.C. § 1341; 53 counts charged him with making false statements in Medicaid and Medicare claims in violation of 18 U.S.C. § 1001; in essence the false claims were submitted for medical services not rendered by defendant; and one count charged him with violation of the Racketeer Influenced and Corrupt Organizations Act (RICO) in violation of 18 U.S.C. §§ 1962(c) and 1963.

Protracted pre-trial proceedings were conducted which included the transfer of the case from District Judge Bailey Brown to District Judge Robert M. McRae, Jr. A jury was selected in the first trial on April 7, 1980. The court advised the parties on April 8 that three jurors were apparently unable to continue and a mistrial was declared on defendant's motion. On April 9, a second jury was impaneled. During the second trial, the government dismissed 101 counts of the indictment and the court dismissed the RICO count 138. The defendant was convicted on 82 counts and was sentenced to two years imprisonment and fined $40,000.

On appeal, appellant makes the following assignments of error:

I. Did the district court err in overruling the defendant's motion to suppress?

II. Was the defendant denied a fair trial and entitled to a mistrial or the granting of a new trial because of jury misconduct?

III. Was the defendant denied a fair trial because of judicial misconduct?

IV. Was character evidence improperly introduced by the government?

V. Is the evidence sufficient to sustain convictions in the following counts: 6, 7, 24–26, 76, 78, 146, 147, 231 and 234–247?

VI. Was it plain error when the district court failed to instruct the jury regarding the use of their notes during deliberations?

VII. Did the district court err in refusing a request to recall Lynn Haag and Asa Boatman as witnesses?

The parties, on May 24, 1982, stipulated, in writing, as to the accuracy of the facts set out in the Counter Statement of Facts on pages 1 *et seq.* of the government's brief which stipulation is part of the record on appeal. (Vol. 1 Appendix ix)

For the reasons hereinafter set forth, we affirm.

I

The Motion to Suppress

Appellant alleges three reasons to support his contention that the district court erred in refusing to grant his motion to suppress. First, he contends that his May 19, 1980, motion to suppress was timely filed. Second, he states that the scope of the search warrant was too broad. And third, he maintains the affidavit for the search warrant contained nothing which would support the conclusion that his records would be found at his medical office at 1029 Whitney Avenue, Memphis, Tennessee, or that the confidential sources relied upon in the affidavit were reliable and credible.

Because we conclude that defendant's May 19 motion was not timely filed, we need not and do not address the various grounds upon which he now relies. With respect to the timeliness issue, we shall briefly review the relevant sequence of events.

On December 21, 1978, defendant filed a "Motion To Suppress Evidence And To Dismiss Or Quash The Indictment". Parts 3(d) and (e) of the motion stated:

(d) The Indictment was obtained solely through the use of illegal, incorrect and prejudicial tactics on the part of the Government.

(e) The Indictment was obtained and is supported only by evidence obtained illegally and is the direct result of impermissible conduct on the part of the Government officials investigating the case.

In responding to these unsupported, conclusory allegations, the government stated, "The allegations contained in subparagraphs 3(d) and (e) of defendant's Motion are too insubstantial to be answered specifically. Accordingly, the government generally denies those allegations." On August 10, 1979, the district court overruled defendant's Motion to Suppress.

Thereafter, on April 7, 1980, just 45 minutes before the first trial was to commence, defendant filed a second "Motion To Suppress Evidence", citing as his reasons that "... the search warrant is facially insufficient in that it fails to establish any basis for the conclusion that the items sought would be found at that location. Further, defendant submits that the affidavit for the search warrant was executed on 25, 1977. (Emphasis added by counsel). Defendant claims that the affidavit was deficient because the month was not written in."

The district court overruled the April 7 Motion to Suppress on grounds of timeliness and on the merits. On April 8 a mistrial was declared for other reasons. A new trial commenced on April 9. Not until the 20th day of the new trial, namely, on May 19, 1980, did defendant "renew" his motion to suppress. The renewed motion alleged for the first time that the evidence[1] should be suppressed because the scope of the search warrant was too broad. The district court concluded that the May 19 motion to suppress was not a renewal of the earlier motion, but rather was a new motion alleging a new reason why the evidence should be suppressed. The court overruled the new motion stating that "... it was not filed in accordance with the rules; it is not the renewal of another motion, it's a new mo-

tion, and it is called a renewal to try to get around the rule."

Fed.R.Crim.P. 12 provides:

(b) Pretrial Motions. Any defense, objection, or request which is capable of determination without the trial of the general issue may be raised before trial by motion. Motions may be written or oral at the discretion of the judge. The following must be raised prior to trial:

.    .    .    .    .

(3) Motions to suppress evidence;

.    .    .    .    .

(f) Effect of Failure to Raise Defenses or Objections. Failure by a party to raise defenses or objections or to make requests which must be made prior to trial, ... shall constitute waiver thereof, but the court for cause shown may grant relief from the waiver.

However, appellant argues this rule is not rigid, citing *Jones v. United States,* 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), and *United States v. Cassity,* 631 F.2d 461 (6th Cir.1980). In *Cassity,* at page 465, we stated:

As the Supreme Court has recognized, the rule requiring criminal defendants to make their suppression motions before trial "is a crystallization of decisions ... requiring that procedure, and is designed to eliminate from the trial disputes over police conduct not immediately relevant to the question of guilt." *Jones v. United States,* 362 U.S. 257, 264, 80 S.Ct. 725, 732, 4 L.Ed.2d 697 (1960), overruled on other grounds, *United States v. Salvucci,* 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980). The rationale usually given for removing suppression questions from the trial itself is that "interrupt[ing] the course of the trial for such auxiliary inquires impedes the momentum of the main proceeding and breaks the continuity of the jury's attention." (cites omitted) Furthermore, a pre-trial decision whether the challenged evidence is admissible gives the Government the time and

---

1. Defendant sought to suppress the records seized during the search of his medical office. Some of these had already been testified about before the jury and had been admitted in evidence.

flexibility to change its theory of the case, to develop or place greater reliance upon untainted evidence or otherwise to modify its trial strategy in response to an adverse ruling. (Cites omitted)

In applying the pre-trial motion rule, "we are dealing with and carrying out an important social policy and not a narrow, finicky procedural requirement." *Jones v. United States, supra,* 362 U.S. at 264, 80 S.Ct. at 732. Where the rule's underlying policy is not implicated, its technical requirements should not be allowed to prevail over constitutional rights.

■ In the case at bar, we believe the rule's underlying policy is implicated. Defendant, who was represented by at least two, and sometimes three lawyers, had 16 months before his trial began in which to file a motion to suppress on the ground that the search warrant was too general. (He did in fact file numerous motions, including two motions to suppress, but they were on different grounds). Instead, defendant waited until the 20th day of his new trial, which was 41 calendar days after the new trial started, before moving to suppress on the ground the search warrant was too broad. By this time the government had rested its case and defendant's own lawyers were well along in presenting his defense. Much of the evidence sought to be suppressed had already been admitted in evidence.

As the district court correctly observed, this third motion to suppress was not a renewal of one of the earlier motions, but rather was a new motion setting out a new reason why the evidence should be suppressed. It was characterized as a "renewal" in order to avoid the sanctions of Fed.R. Crim.P. 12(f).

Granting this untimely motion clearly would have impeded "the momentum of the main proceeding" and would have broken the continuity of the jury's attention. Moreover, since the government had al-

ready rested, it would have no other opportunity to alter its theory of the case or otherwise modify its strategy, as mentioned in *Cassity, supra.*

Fed.R.Crim.P. 12(b) and 12(f) provide that motions to suppress evidence must be raised prior to trial, and that failure to do so shall constitute waiver thereof, unless the court grants relief from the waiver. In the instant case, the district court decided not to grant relief from the waiver. In so exercising its discretion, the court did not abuse it.

■ Appellant further argues that since the district court ruled on the merits of his third motion to suppress, the issue was preserved for appeal. Under the facts of this case, we disagree. The district court overruled the mid-trial motion to suppress on both timeliness grounds and on the merits. That it chose to rule on the merits at all does not alter the fact that the motion to suppress was made in violation of Fed.R. Crim.P. 12(b)(3), nor does it alter the fact that defendant waived the objection under Criminal Rule 12(f). *United States v. Baker,* 638 F.2d 198, 202 (10th Cir.1980); *United States v. Sisca,* 503 F.2d 1337, 1349 (2d Cir.1974), *cert. denied,* 419 U.S. 1008, 95 S.Ct. 328, 42 L.Ed.2d 283 (1974).

## II

### Jury Misconduct

■ Appellant next contends that he was denied a fair trial because of jury misconduct; that the district court erred when it failed to grant his motion to set aside the guilty verdicts thus far returned and to declare a mistrial.

In all, 198 counts were submitted by the court to the jury. After several days of deliberations, the jury returned guilty verdicts on 26 counts and not guilty verdicts on 20 others, thus leaving 152 counts yet to be decided.[2]

2. The alleged jury misconduct took place after the jury had already returned 46 separate verdicts of which 26 were guilty and 20 not guilty verdicts. Such alleged subsequent misconduct could have no affect on the legality of the 26 prior guilty verdicts, where no such misconduct allegedly took place.

The record reveals that the jury foreman, Mr. Barden, either read or heard of a Memphis newspaper article indicating that on the basis of the 26 guilty verdicts thus far returned, defendant could receive a potential sentence of 130 years in prison and a fine of $260,000. Apparently Barden felt the 26 guilty verdicts were enough. He wanted to finish the deliberations quickly. Thus when the jury next met to deliberate, Barden told the other jurors what the potential sentences could be, then announced that he was going to vote not guilty on all remaining counts. This exacerbated the hostility felt by one of the other jurors, Ms. Butler, toward Barden, who stated that Butler told the jury that she had visited defendant's office and knew that he did not have the equipment to perform certain work. Butler insisted, however, that Barden had not listened to her; that she had merely shared the knowledge of medical office practice that she had acquired as a nurse's aide and she had not referred to the defendant's offices.

As the hostility between Barden and Butler increased, they decided to see the judge to report on each other's comments. Such a meeting took place with a court reporter present. Thereafter, the judge fully advised all counsel of the conflict. Defense counsel requested the court to set aside the 26 guilty verdicts thus far returned and to declare a mistrial. Instead, the court re-read part of its instruction to the jury and told the jurors to resume deliberations.[3] When deliberations proceeded, Butler came to believe that Barden was following through on his plan to vote not guilty on all remaining counts; out of spite, she announced she was going to vote guilty on all remaining counts. This conflict between Barden and Butler caused a third juror to see the judge, again with a court reporter present. The court informed all counsel of the events. It then read the Allen charge to the jury and told them to continue deliberating. The jurors did so until they reached verdicts on all remaining counts. Defendant was found guilty on some of the counts, not guilty on many others.

Approximately two months later, on August 12, 1980, the court held an evidentiary hearing to determine whether outside influences were improperly brought to bear on any of the jurors. All but one of the jurors (who was ill) were questioned at length by the court as well as by defense and government counsel. The court concluded that outside influence had not been improperly brought to bear on the jurors. The court found that Barden's efforts to cut the deliberations short were unsuccessful; that the other jurors prevailed upon him to consider all the counts individually. Furthermore, the record reveals that Barden's comments about the possible sentence were not discussed by the jurors, nor was the claim that Butler had visited defendant's office. The court determined that the comments made

3. The court instructed the jury, in part, as follows:

> A separate act or offense is charged in each count of the indictment. You should consider each count of the indictment and the evidence pertaining thereto separately and the fact that you may find the accused guilty or not guilty as to one of the offenses charged should not control your verdict as to the other offenses charged....
>
> I instruct you to completely disregard any information that may have come to you through the news media, or from any persons who have talked to you or talked about this case in your presence, whether in the Federal building or elsewhere.
>
> I instruct you to disregard outside statements regarding this case, for to consider them in your deliberations would be a violation of your sworn duty as jurors....
>
> Keep constantly in mind that it would be a violation of your sworn duty to base a verdict of guilty upon anything other than the evidence in the case.
>
> The punishment provided by law for the offenses charged in the indictment is a matter exclusively within the province of the Court. Therefore, what the punishment might be should never be considered by the jury in any way in arriving at an impartial verdict as to the guilt or innocence of the accused.
>
> I'm going to ask that you retire to the jury room and further deliberate to the end that you will undertake to return verdicts solely on the evidence presented in the courtroom and in the light of the instructions of the Court based upon the law....

by Butler were often made in anger and were intended to irritate Barden. The court also noted that despite Barden's announced intention to vote not guilty, and Butler's intention to vote guilty on all remaining counts, in fact neither of them did this as witnessed by the guilty and not guilty verdicts that were subsequently returned by the jury.

Defense counsel cites *Remmer v. United States,* 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954), (attempted bribery of juror), and *Mattox v. United States,* 146 U.S. 140, 13 S.Ct. 50, 36 L.Ed. 917 (1892), (capital case where bailiff made improper remarks to the jury and where a highly prejudicial newspaper article was read by the jury during deliberations), for the proposition that extrajudicial juror contact is presumptively prejudicial, thus placing upon the government the burden of establishing that the contact was harmless to the defendant.

Both *Remmer* and *Mattox, supra,* are clearly distinguishable from the facts of the instant case. Even so, we do believe that given Barden's outside information about the possible sentence and Barden's comment that Butler was or may have visited defendant's office, a "presumption of prejudice" could have arisen. Thus the burden could have been upon the government to show that the defendant was in fact, not prejudiced. *Remmer* and *Mattox, supra.*

In any event, we believe this burden was met. The jury was admonished time and again that they were to decide the defendant's innocence or guilt only on the basis of the evidence admitted in court; that they were to disregard any reports or information they may have seen in the news media or heard in conversation. Furthermore, the court polled the jury with respect to all verdicts received to insure that each verdict was based "solely on the evidence presented in the courtroom".

In the post verdict hearing held to determine whether matters outside the evidence may have been considered by the jury and resulted in prejudice to the defendant, the court and government and defense counsel carefully questioned the jury. Based on the record of that inquiry, and clearly supported thereby, the court determined that there wasn't any outside influence improperly brought to bear on the jurors. As we stated in *Bullock v. United States,* 265 F.2d 683, 697 (6th Cir.1959), *cert. denied,* 360 U.S. 909, 79 S.Ct. 1294, 3 L.Ed.2d 1260 (1959):

... It is for the judge to decide whether or not private communication is prejudicial. The same rule applies with even more force to public communication which reaches a juror without intention on the part of the broadcaster. In numerous decisions the trial judge has held that a new trial should be had, although information that superficially appeared prejudicial was transmitted to the jury.

Under the facts of this case, the district court properly concluded that defendant had not been prejudiced. In so deciding, in our opinion, the court did not abuse its discretion.

### III

### Judicial Misconduct

■ The third issue raised by appellant involves alleged judicial misconduct. Appellant alleges he was denied a fair trial claiming that the district judge demonstrated an antagonistic and hostile attitude toward defense counsel; that the court criticized their trial conduct, belittled their ability and bullied them.

In arguing for a reversal, defense counsel rely heavily upon *United States v. Hickman,* 592 F.2d 931 (6th Cir.1979). We reversed the district court in *Hickman* because of the pervasive interference and partiality of the presiding judge. In a trial by jury, he interjected himself into the trial more than 250 times; he unduly restricted defense counsel's cross-examination; and in several instances he personally took charge of cross-examining the defense witnesses.

The facts in *Hickman, supra,* differ markedly from those in the case at bar. Defense counsel do not argue that the district court prevented cross-examination or that the court took command of examining or cross-examining the witnesses, but rather that

the court criticized counsels' trial conduct, ridiculed them and belittled their ability.

However, in carefully reviewing each of the examples of alleged misconduct cited to this court, we note that almost all of them were made outside the hearing of the jury. Moreover, we observe that several of the examples cited to us have been taken out of context. They do not reflect that defense counsel persisted in asking leading and/or repetitive questions, or that defense counsel repeatedly sought to elicit irrelevant testimony, or that they frequently disregarded earlier court rulings.

A case more on point than *Hickman, supra,* is *United States v. Weiss,* 491 F.2d 460 (2d Cir.1974), *cert. denied,* 419 U.S. 833, 95 S.Ct. 58, 42 L.Ed.2d 59 (1974). Referring to facts similar to those of the instant case, the court said at page 468:

> ... many of the court's unfortunate comments quoted by appellants occurred outside of the jury's presence and hence could not have influenced the jury. Others were clearly provoked by defense counsel's unnecessary comments or statements in connection with their voicing of objections or by their pressing objections or arguments that were frivolous, repetitious, or in disregard of the court's earlier rulings.... Nor is it surprising that such wasteful tactics will lead a trial judge, during the heat of a nine-day trial, sometimes to become impatient. Judges, while expected to possess more than the average amount of self-restraint, are still only human. They do not possess limitless ability, once passion is aroused, to resist provocation.

This trial went on for more than 20 days and resulted in a transcript in excess of 5,500 pages. No doubt some of the district judge's comments and castigations of counsel would have been better left unsaid. However, a careful review of each example of alleged judicial misconduct cited to us, whether taken individually or cumulatively, does not convince us that the district court lacked impartiality or that defendant was deprived of a fair trial.

## IV

### Character Evidence

In his fourth issue, appellant contends the government erroneously was allowed to introduce inadmissible character evidence, including testimony concerning defendant's performance as a medical student and his conduct as a resident after leaving medical school.

With respect to his academic performance as a medical student, the record reveals that defendant testified that he had had the "opportunity" or "privilege" of taking some courses over again. And with respect to his time as a resident physician, he stated during his direct examination that he "did a residency in surgery at St. Joseph Hospital .... and did a residency in radiology" at Baptist Hospital. Also, through the testimony of a number of witnesses, the defense attempted to portray defendant as a dedicated, hard-working, honorable doctor. It was within this context that the court allowed the government to present rebuttal witnesses who testified that defendant had to repeat two semesters at medical school. There was further rebuttal testimony that he had been forced to resign his surgical and radiological residencies because of repeated absences and tardiness. Thus he never completed either residency.

The relevant standard that a district judge should apply "... is whether, in his sound discretion, the probative value of the proffered testimony outweighs the possibility of undue prejudice to the defendant. Only upon a grave abuse of discretion will his ruling be overturned." *United States v. Jenkins,* 525 F.2d 819, 824 (6th Cir.1975). Under the facts of this case it is clear that the district court did not abuse its discretion.

## V

### Sufficiency of the Evidence

Is the evidence sufficient to sustain convictions in the following counts: 6, 7, 24–26, 76, 78, 146, 147, 231 and 234–247?

The evidence as to defendant's guilt was established beyond a reasonable doubt by the testimony of many witnesses, documents and records. The evidence was overwhelming.

The last two assignment of errors are:

VI. Was it plain error when the district court failed to instruct the jury regarding the use of their notes during deliberations?

VII. Did the district court err in refusing a request to recall Lynn Haag and Asa Boatman as witnesses?

We have reviewed each of these and conclude that they have no merit.

The judgment is affirmed.