786 F.2d 1166
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
 UNITED STATES OF AMERICA, Plaintiff-Appellee,
vs.
RICHARD DAVID GAZIE (83-1851), RODERICK ANDREW McCLAIN
(83-1852), and EDWARD WRAY (83-1860), Defendants-Appellants.
 83-1851, 83-1852, 83-1860
 United States Court of Appeals, Sixth Circuit.
 2/26/86
 
 1
 Before: ENGEL and JONES, Circuit Judges; and SPIEGEL*, District Judge.
 
 
 2
 SPIEGEL, District Judge, delivered the opinion of the Court, in which JONES, Circuit Judge, joined. ENGEL, Circuit Judge, (pp. _____) delivered a separate opinion, concurring in part and dissenting in part.
 
 
 3
 SPIEGEL, District Judge.
 
 
 4
 Richard Gazie, Roderick McClain, and Edward Wray appeal their criminal convictions for various drug-related offenses. The jury found all three quilty of conspiracy to possess and distribute cocaine in violation of 21 U.S.C. Sec. 846 (count 1); McClain was acquitted of interstate travel in aid of racketeering, 18 U.S.C. Sec. 1952 (count 2), distribution of cocaine, 21 U.S.C. Sec. 841(a)(1) (count 3), and conspiracy to possess and distribute marijuana, 21 U.S.C. Sec. 846 (count 5); Wray also was convicted of conspiracy to possess and distribute marijuana, 21 U.S.C. Sec. 846 (count 5).
 
 I. PROCEDURAL HISTORY
 
 5
 On January 14, 1983, a grand jury returned an indictment charging G ie, McClain, Wray, Lyle Parks, and eight others with drug-related violations. In count one, all twelve defendants were charged with conspiracy to possess and distribute cocaine between late 1980 and September 1982 in the Eastern District of Michigan and elsewhere in violation of 21 U.S.C. Sec. 846. In count two, McClain was charged with interstate travel in aid of racketeering in violation of 18 U.S.C. Sec. 1952 for allegedly traveling from Miami to Detroit on January 30, 1982 and thereafter distributing and conspiring to distribute eight ounces of cocaine. In count three, McClain was charged with distributing approximately eight ounces of cocaine on January 30, 1982 in violation of 21 U.S.C. Sec. 841(a)(1). In count four, Parks and Gary Will were charged with possessing with intent to distribute approximately eight ounces of cocaine on January 30, 1982 in violation of 21 U.S.C. Sec. 841(a)(1). In count five, McClain, Wray, and Parks were charged with conspiracy to possess and distribute various quantities of marijuana between 1977 and May 1982 in the Eastern District of Michigan and elsewhere in violation of 21 U.S.C. Sec. 846. All defendants except for the appellants and Parks entered guilty pleas prior to jury selection. Parks pled guilty to count four of the indictment pursuant to a Rule 11 agreement after the impanelment of the jury. The jury trial continued as to counts one, two, three, and five.
 
 II. FACTUAL BACKGROUND
 
 6
 We present the facts in the light offered by the government to the extent that the jury's verdicts indicated that the government's evidence was believed. In view of our disposition of the issues on appeal, only the following brief outline of the facts is necessary.
 
 
 7
 Lyle Parks was instrumental in causing large quantities of cocaine and marijuana to be brought from Florida to Michigan and then sold in various places, including Michigan, Colorado, and Toronto, Canada. Parks resided in Saginaw, Michigan during the period in question. McClain, who resided in Florida, was implicated directly by a co-conspirator in several marijuana transactions, but the jury apparently disbelieved this evidence. The jury did believe, however, the evidence indicating that McClain was a source of cocaine for the Michigan-based members of the cocaine conspiracy. Wray, who resided in several locations in Michigan during the period in question, was involved in transporting, processing, buying, and selling large quantities of both cocaine and marijuana. Gazie, who resided in Florida, was one of Park's cocaine sources. No evidence was presented at trial that even indirectly linked Gazie to marijuana, other than Gazie's association with persons involved in both the cocaine and marijuana conspiracies. Six co-conspirators who previously had pled guilty testified at trial; some of them gave evidence as to only one of the two controlled substances in question, while others testified relating to both.
 
 III. SEVERANCE UNDER RULE 8(b)
 
 8
 Gazie appeals the refusal of the trial court to sever his case from that of the other two defendants.[1] Gazie first raised the issue by oral motion early in the trial; he failed to make a pretrial motion.[2] R., Vol. I, at 90-102. Initially, then, we must decide whether Gazie's motion for severance was timely.
 
 
 9
 First, we note that two other defendants, McClain and Parks, did file pretrial motions for severance. R., Vol. I, at 95. These motions, however, were made on behalf of defendants who were charged in both conspiracy counts. Gazie's severance motion, first made at trial, was distinct therefore in that it was based on Gazie being accused in only one of the two conspiracy counts. Gazie's counsel, moreover, was careful to explain the difference to the trial court when he orally raised the issue. R., Vol. I, at 96-97. Thus, it seems clear that the pretrial motion made by Gazie's co-defendants could not preserve for Gazie his misjoinder claim. See, e.g., United States v. Robertson, 706 F.2d 253, 255 (8th Cir. 1983).
 
 
 10
 We squarely face the question, then, of whether a severance motion made for the first time at trial is timely. Precedent indicates that, at least as to a motion for misjoinder under Fed. R. Crim. P. 8(a) or (b), the motion must be made pretrial.[3] See United States v. Williams, 711 F.2d 748, 750-51 (6th Cir.) (misjoinder under rule (8)(b)), cert. denied, 464 U.S. 986 (1983); United States v. Rox, 692 F.2d 453, 454 (6th Cir. 1982) (misjoinder under Rule (8)(a)). Gazie's oral motion for severance clearly was made based on misjoinder under Rule 8(b). R., Vol. I, at 97. Therefore, the motion was not timely made.
 
 
 11
 Under Fed. R. Crim. P. 12(f), the failure to bring a Rule 8(b) misjoinder motion pretrial 'shall constitute waiver,' except that 'the court for cause shown may grant relief from the waiver.' We therefore turn to whether Gazie may be granted relief despite his failure to raise timely his misjoinder motion.
 
 
 12
 We note that when Gazie orally raised his Rule 8(b) misjoinder motion at trial, the trial judge did not state that the motion was untimely, but instead denied the motion on its merits. R., Vol. I, at 90-102. The trial judge's failure to note the untimeliness of the motion occurred despite the trial judge's awareness that Gazie had not filed a pretrial motion, R., Vol. I, at 94, and despite Gazie's counsel's clear explanation of why his motion for severance was distinct from the motions for severance filed pretrial by Gazie's co-defendants. R., Vol. I, at 96-99. The government, moreover, both at trial, and in its briefs to this Court, has failed to raise the issue of the untimeliness of Gazie's motion.
 
 
 13
 The failure of the trial judge to address the issue of timeliness at trial is potentially prejudicial to Gazie. First, no opportunity was offered Gazie to argue under Rule 12(f) for relief from waiver 'for cause shown.' We therefore lack any record from which to evalute the timeliness issue. Second, assuming that Gazie would have failed to show cause why relief should be granted, Gazie was lulled into believing that he had preserved the issue of misjoinder for appeal, making it appear unnecessary that he make a motion for severance under the more difficult standard of Rule 14.[4] Therefore, the failure of the trial court below to even mention untimeliness as a ground for denying Gazie's motion seems to us to be of more than just technical significance.
 
 
 14
 At issue, then, is whether the trial court's failure to rule on the grounds of untimeliness, or even to take note of the issue, is in effect 'cause shown' such that we may grant relief. See Fed. R. Crim. P. 12(f); 8 J. Moore, Moore's Federal Practice, p12.03 (2d ed. 1985). Pertinent to this inquiry is United States v. Worthington, 698 F.2d 820 (6th Cir. 1983). In Worthington, defendant made his third motion to suppress evidence on the twentieth day of trial. While defendant denominated this action a 'renewal' of his past motions to suppress, it was made on a new ground and hence was ruled to be a new motion. Id. at 823-24. The trial court overruled the motion, under Rule 12(b) and (f), on the basis of its untimeliness. In addition to overruling the motion on timeliness grounds, the trial court also denied the motion on the merits. Id. at 824. On appeal, we stated:
 
 
 15
 Appellant further argues that since the district court ruled on the merits of his third motion to suppress, the issue was preserved for appeal. Under the facts of this case, we disagree. The district court overruled the mid-trial motion to suppress on both timeliness grounds and on the merits. That it chose to rule on the merits at all does not alter the fact that the motion to suppress was made in violation of Fed. R. Crim. P. 12(b)(3), nor does it alter the fact that defendant waived the objection under Criminal Rule 12(f).
 
 
 16
 Id. at 824 (emphasis added) (citations omitted).
 
 
 17
 Worthington is based on sound policy grounds. Trial courts, as well as appellate tribunals, frequently cannot resist the urge to rule on substantive grounds, even after disposing of an issue on procedural grounds. This impulse doubtless arises in part from the desire to demonstrate that substantive justice is not being sacrificed on the altar of procedural nicety. To allow a defendant to overcome a waiver under Rule 12(f) simply on this predilection of the courts, when the timeliness issue in fact has been raised directly and cited as a basis of decision, would create an undeserved windfall, and would undermine the policy of judicial efficiency underlying Rule 12(c)'s requirements.
 
 
 18
 The present case, however, differs from Worthington. Here, the timeliness issue never was mentioned or argued below, and was not relied on by the trial court as even a partial basis for its decision. Defendant thus was prejudiced not only by the lack of opportunity to demonstrate cause under Rule 12(f), but also by the mistaken belief that he had preserved the merits of the misjoinder ruling for appeal, and therefore need not proceed to argue for severance under Rule 14. Under these circumstances, we hold that there is cause shown why relief should be granted from Gazie's waiver of his misjoinder objection.[5] We therefore proceed to a consideration of the merits of Gazie's misjoinder claim.
 
 Fed. R. Crim. P. 8(b) provides:
 
 19
 (b) Joinder of Defendants. Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all the defendants need not be charged in each count.
 
 
 20
 In United States v. Hatcher, 680 F.2d 438, 441 (6th Cir. 1982), we stated: 'The joinder of multiple defendants is proper under Rule 8(b) only if each of the counts of the indictment arises out of the same act or transaction or series of acts or transactions . . ..' The question, then, is whether count one and count five of the indictment, each alleging separate conspiracies to distribute, respectively, cocaine and marijuana, allege 'the same series of acts or transactions constituting an offense or offenses.' Fed. R. Crim. P. 8(b).
 
 
 21
 We note initially that the indictment on its face charges two distinct and separate conspiracies. While the government argues that the two conspiracies could have been joined into one count, Gov. Brief, at 29, it seems plain that an indictment charging one conspiracy is different from an indictment charging two conspiracies. The government could have charged all defendants with conspiracy to distribute both marijuana and cocaine in a single count, if it believed that a single conspiracy existed. If the indictment had been so framed, the fact that one alleged co-conspirator was charged directly with only one type of drug would not, in itself, bar a finding that a single conspiracy to possess and distribute marijuana and cocaine existed. See United States v. Dickey, 736 F.2d 571 (10th Cir. 1984) (single conspiracy to possess and distribute marijuana and cocaine charged), cert. denied, 105 S. Ct. 957 (1985). If the government believed it could establish one conspiracy, and had framed its indictment in such terms, then joinder would have been proper, because an allegation of a common conspiracy satisfies the Rule 8(b) requirement of a 'series of transactions.'[6] See, e.g., United States v. Gentile, 495 F.2d 626, 631 (5th Cir. 1974) (citing United States v. Banks, 465 F.2d 1235 (5th Cir.), cert. denied, 409 U.S. 1062 (1972)). Here, however, the government chose to indict twelve defendants in the cocaine conspiracy count, and only three of those individuals in the marijuana conspiracy count. This division suggests that the government's decision to frame its indictment in terms of two separate conspiracies was based on a well-considered judgment that the available evidence demonstrated that two separate conspiracies, one concerning cocaine, the other marijuana, had existed.
 
 
 22
 Our focal point, thus, is whether the separate conspiracies charged in count one and count five constitute the same series of transactions for purposes of Rule 8(b). In Hatcher, we decided that misjoinder could exist 'even if all counts of the indictment included a common defendant.' 680 F.2d at 441. Thus, that Gazie was the only defendant not common to both counts at the time the motion was made is not determinative. Both defendants in Hatcher were indicted on three counts relating to possession and distribution of heroin during May and June of 1978, and one count of possession of cocaine in February of 1979. Id. at 440. We held, despite the partial overlap in the time periods of the crimes, that 'the indictment on its face alleges no connection between Manetas and the cocaine-related charges again Hatcher,' and we consequently reversed Manetas' heroin-related conviction.
 
 
 23
 The government, during trial and in its appellate brief, attempts to distinguish Hatcher from the present case by noting that the indictment and evidence at trial showed that Lyle Parks caused both substances, cocaine and marijuana, to be moved by common couriers, and that Parks' residence in Saginaw was used to distribute both substances. Gov. Brief, at 28-29. We note, however, these factors: (1) the twenty overt acts alleged in count one (cocaine), with few exceptions, were separate entirely from the seven overt acts charged in count five (marijuana); (2) count one alleged a conspiracy beginning in late 1980 and continuing until approximately September 1982, while count five alleged a conspiracy beginning in 1977 and continuing until approximately May 1982; (3) the indictment charged twelve defendants in count one and only three in count five; and (4) nothing in either the indictment or the proofs at trial linked Gazie in any way to marijuana. Under these circumstances, we hold that count one and count five of the indictment did not constitute the 'same series of transactions,' and thus that the marijuana conspiracy count was misjoined with respect to Gazie.
 
 
 24
 Resolving a conflict among the Circuits, the Supreme Court recently ruled that Rule 8(b) misjoinder claims are subject to a harmless error analysis. See United States v. Lane, 54 U.S.L.W. 4123, 4126 (U.S. Jan. 27, 1986). The Court noted that this Circuit, by virtue of its ruling in Hatcher, had been applying such a test. Id. at 4124 n.1. We proceed, then, to decide whether Gazie was actually prejudiced by the misjoinder. The Lane Court, in considering whether the claimed error before it was harmless, responded in the affirmative, observing, in addition to overwhelming evidence of guilt, that proper limiting instructions were given during the course of the trial and in the final instructions on the law to the jury. The Court further observed that the same evidence that was admitted with respect to the misjoined count likely would come in under Fed. R. Evid. 404(b) during a joint retrial for the purpose of establishing the intent of one of the co-defendants.
 
 
 25
 Previously, this Court had held that misjoinder constituted harmless error "only where the unrelated charge and the evidence supporting that charge is such an inconsequential part of the joint indictment that no possible harm from misjoinder could reasonably have occurred'.' United States v. Bibby, 752 F.2d 1116, 1122 (6th Cir. 1985) (quoting Hatcher, 680 F.2d at 442), app. pnd'g. Prejudice, therefore, was shown 'if the extent of the proof [of the misjoined charges] is significantly greater than that reasonably used to demonstrate other crimes or if [the] focus of the trial is shifted away from proof of the properly joined offense[s].' Id.
 
 
 26
 While the Lane holding plainly is not as broad-based as ours in Bibby, we nonetheless believe that the error claimed by Gazie was not harmless. Lane involved a father and son duo who, between them, arranged for a duplex to be burned as part of an insurance fraud scheme; they were planning to have a flower shop torched for the same purpose. Plans went awry, however, after their arsonist was apprehended for an unrelated crime. In addition, prior to the duplex fire, the father orchestrated a restaurant fire; the son was not involved in this event. Both father and son were indicted. The father was charged in counts 1 (restaurant fire), 2-4 (duplex fire), and 5 (attempted flower shop fire), while the son was charged in counts 2-5 and 6 (perjury before the grand jury investigating their arsonist). The Fifth Circuit ruled that count 1, because it was not part of the same series of transactions, was joined improperly with counts 2-6. Invoking the per se rule, it consequently reversed both convictions and remanded for new trials. As we indicated, on appeal the Supreme Court reversed on this issue. After establishing that a harmless error test was to apply, the Court concluded that overwhelming evidence of guilt, limiting instructions given to the jury during trial and prior to deliberations, and possible admissibility of the evidence relating to the misjoined count upon joint retrial rendered the error harmless.
 
 
 27
 The instant facts are meaningfully different. Defendant Gazie, one of twelve individuals indicted, was charged on only one of five counts and was alleged to be a participant in only one (cocaine) of the two (cocaine and marijuana) drug conspiracies. Such is in sharp contrast to a situation involving two indicted defendants, each charged with five of the six counts handed down by the grand jury. It is true that the jury received limiting instructions in the trial court's final charge. However, the district judge declined to give these during the course of the trial. Not only was the marijuana count a significant part of the indictment, but also the trial record shows that a substantial portion of the proceedings was spent introducing evidence relevant only to the marijuana conspiracy. This evidence concerning marijuana transactions obviously was not admissible against Gazie. Because the potential for confusion of the evidence relating to the two conspiracies was great, we are loathe to term the evidence offered only in support of Gazie's guilt sufficiently overwhelming to pronounce the misjoinder harmless. Further, because, as we will indicate, reversal as to Gazie's co-defendants is not warranted, no joint retrial will occur, thus eliminating the Supreme Court's concern that evidence relevant to the misjoined count inevitably will be admitted. Consequently, for these reasons, we believe that the evidence admitted as a result of the misjoinder exerted an injurious influence upon the jury.
 
 
 28
 We hold, then, that the misjoinder of the cocaine and marijuana conspiracy counts was prejudicial to Gazie in that it substantially influenced the jury; thus, the conviction of Gazie under count one of the indictment must be and is hereby reversed. McClain and Wray also appeal based on the trial court's failure to grant severance.[7] While we reverse as to Gazie in this regard, we decline to do the same with respect to his co-defendants. As noted earlier, because McClain and Wray were named in both conspiracy counts, their situations differ significantly from that of Gazie. After a careful review of the indictment and record, we conclude that the trial court's refusal to sever McClain and/or Wray neither was an abuse of discretion nor error.
 
 IV. EXHIBIT SEVEN
 
 29
 Gazie and McClain[8] also appeal the trial court's admission of government exhibit 7 into evidence, and the failure of the trial judge to give a limiting instruction thereto. Exhibit 7 originally was used as an adjunct to testimony and closing argument. The exhibit displayed the names of places, and, underneath each place, a list of alleged conspirators.[9] Defendants did not below, and do not now, object to the chart's use during the trial. R., Vol. XIII, at 1654, 1656; Gazie Brief, at 28-32. Defendants, however, did below and do on appeal object to the exhibit's admission into evidence and subsequent availability in the jury room.
 
 
 30
 The trial judge admitted the chart into evidence under Fed. R. Evid. 1006. Initially, we note that Rule 1006 provides only for the admission of summaries of voluminous writings, recordings, and photographs. Without a doubt, however, the government's counsel offered the exhibits as a summary of the testimony presented during trial.[10] As we noted in United States v. Scales, 594 F.2d 558, 563 (6th Cir.), cert. denied, 441 U.S. 946 (1979), summaries of testimony 'cannot be said to come within the requirements of Rule 1006.' Rather, authority for their introduction would exist under Fed. R. Evid. 611(a).[11] Id. at 563-64 (citing J. Weinstein & M. Berger, 5 Weinstein's Evidence p1006 at 1006-9 (1983) (hereinafter Weinstein's Evidence)).
 
 
 31
 When summaries of testimony are introduced into trial under Rule 611(a), their purpose is 'simply to aid the jury in its examination of the evidence already admitted.' Scales, 594 F.2d at 563. Because of the danger of misleading the jury, we have required a limiting or guarding instruction 'to the effect that the chart is not itself evidence but is only an aid in evaluating the evidence.' Id. at 564. Even with such a limiting instruction, there is authority to the effect that the better practice is to allow the exhibit to be used only as a demonstrative adjunct to testimony, and not to allow the chart to be formally admitted into evidence and thus go to the jury room. See 5 Weinstein's Evidence p1006 at 1006-16 (such pedagogical devices 'should not be allowed into the jury room without the consent of all parties since they are more akin to argument than evidence') (footnote omitted). Some charts, moreover, are so misleading or conclusory that their use in any fashion during trial would be improper, even with limiting instructions. Scales, 594 F.2d at 564.
 
 
 32
 In the present case, while the government stated that it wanted the chart admitted into evidence only as an 'aid' to the jury because of the sheer volume of testimony given during trial, no limiting instruction was given. It was error for the trial judgment to have permitted the exhibit to be admitted formally into evidence, and used by the jury during its deliberations, without such an instruction. As noted above, the admission of such an exhibit into the jury room, even with a limiting instruction, is itself open to question. At a minimum, the jury needs to be told that the chart is not to be relied on as substantive evidence.
 
 
 33
 Defendants made a timely objection to the chart's admission into evidence, but did not request a limiting instruction. In United States v. Seelig, 622 F.2d 207, 214 (6th Cir.), cert. denied, 449 U.S. 869 (1980), this Court responded to a failure to give a limiting instruction concerning a summary exhibit simply by noting that defendant had not asked for one. We decline to decide the present case on the basis that the defendant's objection did not preserve for appeal the failure to give a limiting instruction. Rather, we hold that the failure to give a limiting instruction was harmless error as to McClain. The major danger to McClain, aside from the possibility that the jury might perceive the chart as substantive evidence, arose from the chart's failure to list separately the participants in the cocaine and marijuana conspiracies. Given the jury's ability to separate the offenses with which McClain was charged, as demonstrated by the jury acquitting him on the marijuana conspiracy, distribution of cocaine, and racketeering counts, while convicting him on the cocaine conspiracy count, we find that he was not so prejudiced. See United States v. Conlin, 551 F.2d 534, 539 (2d Cir.), cert. denied, 434 U.S. 831 (1977) (defendant not deprived of fair trial by improper use of chart when jury acquitted on five of thirteen items with which chart dealt).
 
 
 34
 The failure to separately list the participants in the two conspiracies may have been prejudicial to Gazie, who, unlike McClain, was charged in only one of the two conspiracy counts. Obviously, the jury had no opportunity to demonstrate its separation of the cocaine and marijuana evidence in regard to Gazie, who was convicted of the single charge against him. But because we already have reversed Gazie's conviction on the basis of misjoinder, we need not decide whether Gazie was prejudiced.
 
 V. SURVEILLANCE LOCATION PRIVILEGE
 
 35
 Wray and McClain[12] appeal based on the district court's refusal to require the government to reveal the type and location of electronic surveillance microphones. The investigation leading to the indictments included judicially-authorized wiretaps, which recorded telephone conversations, and judicially-authorized electronic surveillance, which recorded conversations occurring at certain residence. Defendants, during trial, sought information concerning the type of electronic surveillance microphones used, and the exact location within the residences of each microphone for the purpose of disputing voice identification evidence introduced by the government. They argue that, because the microphones were placed in a container for the purpose of concealing them, the recorded voices were distorted. To introduce expert testimony as to the likelihood and kind of distortion, defendants claimed a need to know both the type and location of the devices.
 
 
 36
 The government countered with a surveillance location privilege, maintaining that future law enforcement efforts would be hindered greatly if this information was revealed. The trial judge conducted an ex parte, in camera hearing[13] at which the government amplified its position. On the basis of such information presented to the Court, notwithstanding defendants' proffered reasons, the trial judge upheld the government's refusal to disclose the particulars of its surveillance techniques.[14]
 
 
 37
 In United States v. Harley, 682 F.2d 1018, 1020-21 (D.C. Cir. 1982), the Court of Appeals for the District of Columbia Circuit upheld application of the surveillance location privilege to trials on the merits. Analogizing the surveillance location privilege to the informer's privilege, the court stated that defendants seeking such information must demonstrate their need for the information, after which the trial judge should weigh a defendant's handicap against the policies underlying the privilege. Id. at 1020 (citing Roviaro v. United States, 353 U.S. 53, 60, 62, 77 (1957)).
 
 
 38
 Harley concerned the government's refusal to disclose the location of an apartment used for police surveillance. Defendants sought this information to cast doubt on the officers' ability to make identifications from their surveillance site. Id. at 1020. Plainly, defendants' desire in the present case to cast doubt on the government's voice identification evidence is analogous. The Harley court was concerned with the safety of the cooperating apartment owner, and with the willingness of citizens to so cooperate with police in the future. Id. While this exact concern is not implicated here, the same underlying principle applies: if the information is revealed, future law enforcement efforts will be hindered. We therefore find that the surveillance location privilege, as articulated in Harley, is applicable to information regarding the type and location of electronic surveillance devices used by the government in building its case for prosecution.
 
 
 39
 Without a doubt, in some instances, information sought by a defendant may be so critical that his Sixth Amendment right to confrontation would outweigh the government's asserted needs for the privilege. The fundamental importance of the defendant's right to a fair trial, in those cases, would have to be honored. See, e.g., United States v. Porter, 701 F.2d 1158, 1162-63 (6th Cir.) (refusal to allow defendants to examine surveillance equipment improper if defendants were deprived of fair trial), cert. denied, 464 U.S. 1007 (1983). The government then would have the option of revealing the requested information, or maintaining its secrecy by not using the evidence derived from the particular surveillance device or location in uestion.
 
 
 40
 The balancing process recited above takes place after careful evaluation of the particular facts of each case. In the present case, because the government's articulated need for the privilege was substantial and the handicap to defendants, if any, was minimal, we hold that the trial judge's decision was proper. Numerous factors support his finding that defendants were not unduly handicapped. To begin, McClain's voice was absent entirely from the tapes used by the government at trial. See McClain Brief, at 1. While Wray's voice was intercepted during several telephone coversations by the use of a wiretap, the information defendants' sought concerned the electronic surveillance, rather than wiretap, technology that allowed the government to record conversations occurring within certain residences. Wray claims that his voice was present in the background of one of the recorded telephone conversations, and that, therefore, in at least that instance, the device employed must have been something in addition to a wiretap. Initially Wray's allegation strikes us as most unlikely, but even if true, he fails to articulate the importance of indentifying his voice when recorded as background, given that a clear opportunity also existed during these same conversations for identifying his voice when he was speaking directly into the telephone. Accordingly, the government's refusal to disclose in no way affected voice identification evidence relating to either of the defendants.
 
 
 41
 We recognize that the identification of the voices of co-conspirators is of some significance, yet we note that all but one of the participants in the disputed conversations were present and testified at the trial. Defendants consequently had ample opportunity to cross-examine, thus minimizing to a significant extent their need for type and location information for the purpose of countering voice identification of co-conspirators. Finally, we observe that the conversations recorded by electronic surveillance were but a minor part of the government's case. Ample testimony corroborated evidence revealed through the tapes.
 
 VI. CONCLUSION
 
 42
 We have carefully considered the remainder of appellants' arguments and find them to be without merit.
 
 
 43
 For the reasons stated above we affirm the convictions of appellants McClain and Wray. We reverse Richard Gazie's conviction on count one, and remand for further action not inconsistent with this opinion.
 
 
 44
 ENGEL, Circuit Judge, concurring in part and dissenting in part.
 
 
 45
 I respectfully dissent from the majority decision to the extent it reverses the conviction of defendant Gazie because of misjoinder. It is true, as the majority opinion points out, that Gazie's involvement in the conspiracy appears limited solely to his dealings in cocaine, and not in marijuana. In my opinion, however, even if the cocaine and marijuana conspiracies were separate, as alleged in the indictment, it was not error for the trial court here to have denied their severance. Judge Harvey's reliance upon United States v. Porter, 701 F.2d 1158 (6th Cir. 1983), was well placed and was in accord with our court's views on severance, as expressed in United States v. Grunsfeld, 558 F.2d 1231 (6th Cir. 1977); United States v. Mayes, 512 F.2d 637 (6th Cir. 1974), and other citations thereon. See also United States v. Lane, No. 84-744, slip op. (U.S. Jan. 27, 1986). The conspiratorial network involving the defendants here and the other unindicted or untried members of the conspiracy was complex and extensive both geographically and in time. Gazie's activities, though confined to cocaine, were clearly linked to members who were involved in trafficking in both substances during the same time, through the same couriers and other facilities such as those in Saginaw, Michigan, and through the services of Frank Durastanti in Florida.
 
 
 46
 The majority opinion appears to place importance upon the acquittal of defendant McClain on the marijuana-related charges as evidence of the jury's refusal to believe the testimony concerning the marijuana aspect of the trial. In my opinion, this post hoc conclusion that the counts were improperly joined in the first place does not necessarily follow. While we cannot know what prompted the jury's action in acquitting McClain of Count 5, it would not be surprising if the jury concluded that McClain's involvement in both marijuana and cocaine was all part of a single conspiratorial agreement, or that the law was sufficiently vindicated if they convicted him only of the cocaine conspiracy. Certainly, there is ample evidence tying him to both through the testimony of Albert Papson and others.
 
 
 47
 It is quite true that Gazie's specific involvement was limited to cocaine. He had a reliable source of substantial quantities of cocaine and he dealt with the several co-conspirators under circumstances in which he had to know and understand that it was being moved through the conspiracy and out into the rest of the United States at profit to him. The majority does not find that the evidence was insufficient to convict Gazie of the cocaine conspiracy and indeed the evidence of his involvement in this regard must be described as massive. For this reason alone, it is difficult to see how Gazie could in any event have been prejudiced by the evidence which was placed before the jury concerning the movement of marijuana. His attorney was very alert to interpose objections to the testimony of the witnesses concerning marijuana, and thus brought to attention then and through the instructions of the court Gazie's noninvolvement in marijuana. That the jury itself saw fit to acquit McClain of the marijuana conspiracy is at least some indication that it was able to separate the involvement of the different defendants and to follow the instructions of the trial court.
 
 
 48
 With complicated conspiracies, such as this appears to have been, it is not surprising that one conspirator will deal in one aspect of a conspiracy and that others may deal in other aspects. That one conspirator participates in but one phase of a conspiracy does not isolate him from involvement in the conspiracy as a whole nor compel his severance where the proofs are so intertwined. Had Gazie been charged with involvement in the marijuana conspiracy or had but one conspiracy been alleged, a more serious problem might have been faced, especially had he been convicted of all counts. That is not the case here, however.
 
 
 49
 In all other respects, I agree with the majority opinion, and I agree also with Judge Spiegel in his determination that the severance question raised by Gazie was properly preserved for appeal.
 
 
 
 *
 The Honorable S. Arthur Spiegel, District Judge of the United States District Court for the Southern District of Ohio, sitting by designation
 
 
 [1]
 Gazie relies on Fed. R. Crim. P. 8(b), rather than Fed. R. Crim. P. 14. We delineated the difference between the two rules in United States v. Williams, 711 F.2d 748 (6th Cir.), cert. denied, 464 U.S. 986 (1983)
 A motion for severance based on misjoinder under Rule 8 alleges an error in the indictment, and severance must be granted if the defendants were improperly joined. Rule 14 comes into play only if joinder was initially proper under Rule 8 but a joint trial would prejudice one or more defendants. It is addressed to the discretion of the trial judge. A denial of severance is reviewable to determine if there was an abuse of discretion.
 Id. at 750 (emphasis original) (citations omitted).
 
 
 [2]
 On appeal, Gazie appears to claim that he raised the issue of severance before trial. Gazie Brief, at 11. Wray similarly claims that all three appellants made motions to sever under Rule 8(b) prior to trial. Wray Brief, at 7. The record reveals that Gazie's attorney, during trial, represented to the district court that he had made a pretrial motion to sever. R., Vol. I, at 92. The trial judge then examined his motion file and the docket sheet, and discovered that only McClain and Parks had filed motions to sever. R., Vol. I, at 93-95. Gazie's attorney then specifically acknowledged that no motion for severance on behalf of his client had been filed. R., Vol. I, at 94. Our own review of the docket sheet, moreover, fails to disclose a pretrial motion for severance by Gazie. Under these circumstances, we find that no such pretrial motion was made
 
 
 [3]
 Federal Rule of Criminal Procedure 12(b) states in relevant part:
 (b) Pretrial motions. . . . The following must be raised prior to trial:
 * * *
 (2) Defenses and objections based on defects in the indictment or information . . ..
 
 
 [4]
 While we do not purport to decide the question, there is precedent suggesting that a Rule 14 motion for severance sometimes may be raised for the first time at trial even when a Rule 8(b) misjoinder motion would have been waived. See generally Schaffer v. United States, 362 U.S. 511, 516 (1960) ('trial judge has a continuing duty at all stages of the trial to grant a severance if prejudice does appear' when conspiracy court dismissed during trial); United States v. Rox, 692 F.2d 453, 454 (6th Cir. 1982) (court denied Rule 8(b) motion raised during trial as untimely, but considered on its merits Rule 14 motion also made during trial); 1 Wright, Federal Practice and Procedure, Criminal 2d Sec. 221, at 769-75 (2d ed. 1982). But see Williams, 711 F.2d at 750; United States v. Swainson, 548 F.2d 657, 661 (6th Cir.), cert. denied, 431 U.S. 937 (1977); Fed. R. Crim. P. 12(b)(5)
 
 
 [5]
 Our holding is not based on the government's failure to make a timely argument that defendant waived its objection. See 8 J. Moore, Moore's Federal Practice p12.03 at 12-29 to 12-30 (2d ed. 1985) (collecting cases on whether government must make a timely argument of waiver under Rule 12)
 
 
 [6]
 Of course, we are not suggesting that the government routinely charge one conspiracy when it lacks proof that only one conspiracy existed. If the indictment charges one conspiracy, but the evidence at trial indicates several, the defendant can argue that there is a prejudicial variance between the indictment and the evidence. See, e.g., Dickey, 736 F.2d at 581-83; United States v. Warner, 690 F.2d 545, 548 (6th Cir. 1982)
 
 
 [7]
 While McClain fails to cite directly Rule 14, he admits that joinder was proper under Rule 8(b); accordingly, we view his appeal as if grounded on Rule 14. McClain Brief, at 22-26. Wray, however, plainly relies on Rule 8(b)
 
 
 [8]
 McClain adopted Gazie's argument on this issue pursuant to Fed. R. App. P. 28(i)
 
 
 [9]
 The chart also contained the dates of Wray's two Michigan residences. In their appeals, defendants do not quibble over inclusion of these dates. See Gazie Brief, at 28-29
 
 
 [10]
 'I would offer the chart as an aid for the jury to take into the jury room with them, only because of the sheer volume of people that have been testified about during the course of this trial.' R., Vol. XIII, at 1652
 
 
 [11]
 Rule 611(a) is a codification of the traditional power and obligation of trial judges to control the presentation of evidence. It provides:
 The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment.
 Rule 611(a) gives trial judges the authority to decide questions relating to demonstrative evidence. See Fed. R. Evid. 611 advisory committee notes. Rule 1006, in contrast, is concerned with the application of the best evidence rule to 'voluminous writings, recordings, or photographs which cannot conveniently be examined in court.' Rule 1006 allows for such evidence to be 'presented in the form of a chart, summary, or calculation.'
 
 
 [12]
 McClain adopted Wray's argument on this issue pursuant to Fed. R. App. P. 28(i)
 
 
 [13]
 On behalf of the panel, Judge Spiegel examined this sealed portion of the record
 
 
 [14]
 Critical to our review of this question was the record created by the trial judge by virtue of his conducting the ex parte, in camera hearing and by later listing for the parties the factors underlying his decision in favor of the United States. We urge all trial judges faced with such an issue to conduct themselves in a similar fashion